NO. 07-04-0467-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

JUNE 7, 2005
_____

IN THE INTEREST OF K.M., a child
_____

FROM THE 320th DISTRICT COURT OF POTTER COUNTY;

NO. 67,878-D; HON. DON EMERSON, PRESIDING
_____

***Memorandum Opinion***
_____

Before QUINN, C.J., and REAVIS and CAMPBELL, JJ.

Annie Dora Marsh appeals from an order terminating her parental relationship with her daughter, K.M. The latter was removed from her care several days after K.M.'s birth. The sole issue before us concerns whether the evidence was sufficient to support a finding that termination was in the best interests of K.M. Marsh does not argue that the State failed to prove a statutory ground for termination but rather that no one said termination would be in the best interests of the child. We affirm the order of the trial court.

*Applicable Law*

The applicable standard of review is discussed in *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002) and *In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002). We refer the litigants to them for a discussion of it.

Next, we note that the evidence establishing a statutory ground for termination may also be used to support a finding that the best interests of the child warrant termination of the parent/child relationship. *In re C.H.*, 89 S.W.3d at 28; *In re P.E.W.*, 105 S.W.3d 771, 779 (Tex. App.–Amarillo 2003, no pet.). Also noteworthy are the indicia which have become known as the *Holley* factors. Espoused in *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976), they were considered helpful by that court in assessing the child's best interests. Included among them are: 1) the desires of the child; 2) the emotional and physical needs of the child now and in the future; 3) the emotional and physical danger to the child now and in the future; 4) the parental abilities of the individuals seeking custody; 5) the programs available to assist those individuals to promote the best interests of the child; 6) the plans for the child by those individuals or by the agency seeking custody; 7) the stability of the home or proposed placement; 8) the acts or omissions of the parent which may indicate that the existing parent/child relationship is not a proper one; and 9) any excuse for the acts or omissions of the parent. *In re P.E.W.*, 105 S.W.3d at 779-80. Though helpful in assessing the situation, one need not prove that each *Holley* factor favors termination, however. *Id.* at 780. Nor is the list exhaustive because other indicia may also be relevant. *In re C.J.F.,* 134 S.W.3d 343, 354 (Tex. App.–Amarillo 2003, pet. denied). Again, all the State need do is present enough evidence from which the factfinder can reasonably form a firm conviction or belief that the child's best interests warrant termination. *In re P.E.W.*, 105 S.W.3d at 780.

*Application of Law*

Here, no one questions the evidence illustrating that Marsh suffered from a life-long mental disorder (schizophrenia) which would most likely prevent her from ever being able

2

to physically care for K.M. So too was it shown that the disorder involved paranoid delusions and, in the opinion of the testifying psychologist, people suffering from that kind of illness "tend to be the most dangerous people out of all mental disorders." They were "the type of people that buy high-powered rifles and get up on top of buildings and shoot people," he continued. Moreover, at least one witness testified Marsh recently had purchased a firearm, took lessons in how to use it, and made comments about doing what she needed to do to retrieve her children. So too did witnesses testify that she threatened to shoot various people in the head.

Also appearing of record is evidence that 1) appellant had an I.Q. of 71, which placed her intelligence range within the third percentile of those her own age, 2) though subject to treatment, appellant would stop taking the medication prescribed her, 3) appellant waived her parental rights *viz* her older child after he was removed from her custody due to her inability to adequately care for him, 4) appellant lacked the "skills to be able to adequately care for a child" and would need around the clock help if the child was left in her care, 5) appellant never had been employed, 6) the Texas Panhandle Mental Health Mental Retardation organization had the responsibility of assuring that appellant appropriately spent her monthly disability check, 7) appellant had been arrested for assault, 8) appellant threatened to harm a Child Protective Services (CPS) case worker, the foster parent of her child, and a worker for the Panhandle Assessment Center who monitored her visits with the child, 9) appellant was seen talking to herself at a court hearing, 10) appellant sometimes called herself and her child by other names, 11) appellant said that she would "have to murder the bitch," 12) appellant became agitated during visits with her child, was not able to comfort the child, would talk to the wall, and would allow the baby's head to flop

3

over during those times, 13) there was no bond between appellant and K.M., 14) appellant testified in court that she bought a gun because she had "been having a lot of people jump on [her] lately and threatening [her]" and that people were threatening to kill her children because they did not like her, and 15) appellant had been seen outside the CPS offices on all fours barking like a dog. Further evidence indicated that 1) the child needed a safe and secure environment, 2) placement with the older child's foster mother could not be considered because a special license had been given to that foster mother for only one child, 3) the child's grandmother and great-grandmother were not suitable caretakers for the child, 4) the child had bonded with her foster mother, 5) the plan was for adoption by the foster mother who would be able to receive an adoption subsidy, Medicaid, and college tuition for the child, 6) the foster mother lived in a three-bedroom brick home in a nice area of town, and 7) the child was developing regularly in her foster home. Finally, there was testimony that it would be in the child's best interests to be placed in her current foster home.

Testimony that a mother cannot provide a stable, safe, and secure environment supports a finding that it is in a child's best interests to terminate the mother's rights. *See Hamm v. Texas Dep't of Protective and Regulatory Services,* 969 S.W.2d 77, 83-84 (Tex. App.–El Paso 1998, pet. denied) (upholding the termination because evidence appeared of record illustrating that the parent could not provide such an environment). Ample, undisputed testimony appears in the record at bar to illustrate that Marsh could not provide K.M. with such an environment. And, while it may be true that no witness expressly said that the best interests of the child favored termination of appellant's rights, the evidence before the trial court is sufficient to uphold such a finding. At the very least, it was enough

4

to enable the factfinder to reasonably form a firm conviction or belief that termination was in the child's best interests.

Accordingly, we overrule the point of error and affirm the order terminating the parental relationship between Marsh and K.M.


Per Curiam